# CASES

## ARGUED AND DETERMINED

### IN/ THE

# SUPREME COURT OF VERMONT.

STATE *vs.* TAYLOR and O'DONALD.

January Term, 1896.

Present: Ross, C. J., ROWELL, TYLER, MUNSON, START and THOMPSON, JJ.

*Arrest on Suspicion of Felony Committed in Another State—Officer's Duty to Disclose his Character and Purpose—Circumstances of Arrest as Affecting Grade of Offence in Resisting—Intent—Evidence.*

An officer may arrest without a warrant a person of whom he has reasonable cause to believe that he has committed a felony in another state.

An officer in making an arrest is bound to make known the fact that he is acting as an officer, but is not bound to exhibit his warrant or, in case he have none, to explain the grounds of his action, until after submission has been made to his authority.

An officer with three assistants went out to meet and take a party of four whom he was justified in arresting without a warrant upon suspicion of felony. When they met, the officer announced that he arrested them by the authority of the State. The leader of the party asked to see his papers, and the officer replied, drawing a revolver from his pocket and immediately returning it thereto, "This is all the papers I need;" whereupon the leader cried, "You can't take this party without papers," and all, as the evidence tended to show, fired upon the officer and his assistants. Upon trial of two of the party for assault with intent to

murder, it was held that there was nothing in the manner of the arrest which could reduce the grade of the offence if the respondents made the assault with intent to kill.

The respondents might, under such circumstances, be convicted of assault with intent to murder, upon proof of intent to kill, because the fact that they were resisting arrest supplied the element of malice; but they could not be convicted of anything beyond a common assault without proof of an actual intent to take life.

Even though the four were acting together with a common purpose of resisting arrest, the fact that one of them shot the officer in the execution of that design and with the intent to kill, while the others were present assisting in the assault, does not make the others guilty of an assault with intent to kill unless they had the same intent.

It would doubtless be otherwise if they were acting upon a common understanding that they would do whatever might be necessary to avoid arrest.

The officer was properly allowed to testify that he was a constable and acting as such at the time of the arrest. It was not necessary to prove his official character by the record.

The testimony of the assistants that they were called upon by the officer "to help him arrest some burglars," was properly received.

Four having been arrested and two only being on trial, it was not error to permit the State to show that the other two had been transferred to another jurisdiction.

As tending to show that the officer had reasonable cause to believe that the respondents had committed a felony, it was proper for the State to show what information was communicated to him, and its sources.

Evidence was also admissible tending to show the actual commission of the felony and the respondents' connection therewith.

The State was permitted to show that near the close of the affray one of the respondents ran off and hid in the bushes, and that he was afterwards brought in, and that when the physician came to dress his wounds and asked his name, age, and residence, he remained silent. *Held*, no error, the first being admissible as an incident of the affray, the second as an incident of the general transaction, and the third as subsequent conduct indicative of guilt.

INDICTMENT for an assault with intent to kill and murder. Trial by jury at the May Term, 1895, Windsor County, *Taft*, J., presiding. Verdict and judgment of guilty, and sentence imposed at the respondents' request. The respondents excepted.

*W. E. Johnson* and *Butler & Moloney* for the respondents.

*J. C. Enright*, State's Attorney, and *W. W. Stickney* for the State.

MUNSON, J.   The alleged assault was committed upon Paul Tinkham, constable of Rochester, and three persons acting under him, while they were effecting an arrest of the respondents and two others, without a warrant, on suspicion of felony.   The officer acted upon information received from Brandon by telephone, to the effect that the post office at Ticonderoga, N. Y., had been burglarized the night before, and that four persons suspected of the crime had left Forestdale going in the direction of Rochester. When met by the officer and his assistants the suspected party were coming along the highway in a wagon driven by a liveryman from Forestdale.   The jury have found under the charge of the court that when Tinkham met the respondents' party he said to them that he arrested them by the authority of the State of Vermont, and that upon inquiry being made as to which was the officer, Tinkham was designated as such by one of his party.   The remainder of the transaction must be taken to have been in accordance with the testimony most favorable to the respondents' claim.   The purport of this was that one of the respondents' party then asked Tinkham if he had any papers, and that Tinkham thereupon pulled a revolver from his pocket, saying that was all the papers he needed, at once returning the revolver to his pocket; and that respondent Taylor then said with an oath, "You can't take this party without papers," and that upon this all four of the suspected persons commenced to get out of the wagon, some of them firing at the constable's party as they did so.

The jury were instructed in substance that if Tinkham had reasonable cause to suspect that the respondents had committed a burglary, he could arrest them without a warrant; and that if he told them that he arrested them by the authority of the State of Vermont, and if they knew he

was an officer, it was their duty to submit; and that if they shot the officer under these circumstances they were guilty of an assault with intent to murder. The respondents insist that the officer had no right to arrest without a warrant for a felony committed in another state; and that if he had that right, there was a failure to disclose his authority which justified their resistance; and that in any event the manner of the arrest was such that the grade of the offense should have been left to the determination of the jury.

It has long been held in most of the states that when one charged with the commission of a felony in one state escapes to another, he may be there arrested and detained before a demand for his return has been made by the governor of the state from which he has fled. In most of the cases where this doctrine has been enunciated, the arrest was made upon the warrant of a magistrate. But in *State* v. *Anderson*, 1 Hill (S. C.) 327, it was held that an arrest by a private person, without warrant, could be justified by showing *prima facie* that a felony had been committed in another state, and that the party arrested was the perpetrator. It is clearly the tenor of the decisions that the machinery provided for the arrest of local offenders is available for the arrest of fugitives from another jurisdiction; and it must follow that when the arrest without warrant is made by an officer, it will be sufficient for his justification if it appear that he had reasonable cause to believe that the person arrested had committed a felony in another state, although more than this may be required for his detention when brought before a magistrate. So, in *Re Henry*, 20 How. Pr. 185, it was said that the officers were undoubtedly authorized to arrest the prisoner upon reasonable ground of suspicion, although there was no proof on the hearing that the suspicion was well founded.

It is well settled that the person whose arrest is attempted must have notice of the authority and purpose

of the person who undertakes to arrest him.   The first case in which this matter is elaborately treated is that of *Mackaley*, reported in Croke Jac. 279, and more fully in 9 Coke 61.   The arrest was in London, by a sergeant of the mace.   The officer, having his mace at his back, but without showing it, clasped the prisoner about the body, saying, "I arrest you in the king's name" at the suit of such a person for such a debt, whereupon the officer was attacked and mortally wounded.   The prisoner having been convicted of murder, the questions presented were considered by all the judges of England.   It was argued that the arrest was illegal because made in the darkness of night, when the prisoner could not know the officer.   To this the court said, "Although he cannot see the officer, yet when he hears him say, 'I arrest you in the king's name,' etc., he ought to obey him, and if the officer has not a lawful warrant he shall have his action of false imprisonment.'"   It was further objected that the statement made by the officer at the moment of the arrest did not contain all the particulars held essential in *The Countess of Rutland's Case*, 6 Coke 52; but it was said that the requirement in that case was to be applied when the party submits himself to the arrest, and not when he resists the officer and interrupts him before he can speak all his words.   As to the necessity of producing the mace in connection with the words of arrest, it was said to be beyond question that the sergeant had not to show his mace, and that if an officer were required to show his mace it would be a warning for the party to fly.   So upon the whole case it was unanimously held that if an officer who hath execution of process be slain in doing his duty, it is murder in him who kills him, and that there need not be any inquiry of malice.

In *Rex* v. *Woolmer*, 1 Moody 334, decided two centuries later, the judges went even further in sustaining a conviction, although not with entire unanimity.   This case grew out of an arrest without warrant on information of

an attempt to rob. The arrest was made in the night by a watchman, dressed in a watchman's coat and carrying a lantern. The jury found that the prisoner knew him to be a watchman. All he said to the prisoner was, "You must go back and come along with me." He did not explain why, nor was any charge against the prisoner stated. Here, it might be urged with some force that in view of the failure to use any formal words of arrest there should have been a statement of the charge for which the prisoner was wanted, in order that he might clearly understand that the watchman was acting in his official capacity. But it was resolved by nine of the thirteen judges who considered the case, that "the watchman could legally arrest the prisoner without saying that he had a charge of robbery against him, though the prisoner had in fact done nothing to warrant the arrest; and that had death ensued, it would have been murder. This case is ample authority to sustain the sufficiency of the words of arrest employed on this occasion, unless it be considered that a more explicit statement was required by the fact that inquiry was made regarding the possession of papers.

It is frequently said in the text-books and in judicial discussions that an officer must show his warrant or state the ground of the arrest, if demanded. But an examination of the authorities will show conclusively that this is not a part of the arrest, but a duty which immediately follows it. Upon submitting to the officer the arrested party is entitled to this information, but he cannot put off the arrest and increase his chances of escape by requiring an explanation in advance. In *Bellows* v. *Shannon*,. 2 Hill (N. Y.) 86, where it is said that either before or at the moment of the arrest the officer ought to say enough to show the party that he is not dealing with a trespasser but with a minister of justice, it is further remarked, "I do not say that the officer is bound to declare the particulars of his authority before he makes the arrest, or that it may not sometimes be

proper to lay hands on the party before a word is spoken." In *Commonwealth* v. *Cooley*, 6 Gray 350, where the respective duties of the officer and the arrested party are considered, it is said that the accused is required to submit to the arrest, to yield himself immediately and peaceably into the custody of the officer, and that the officer can have no opportunity to make the accused acquainted with the cause of his arrest until he has brought his prisoner into safe custody. Continuing, it is said, "These are obviously successive steps. They cannot all occur at the same instant of time. The explanation must follow the arrest; and the exhibition and perusal of the warrant must come after the authority of the officer has been acknowledged."

It is evident from the adjudged cases that in the rule above stated, as to what is essential in making an arrest, notice of the officer's authority means notice of his official character and not of the exact circumstances which authorize the arrest, and that notice of his purpose relates to the purpose to arrest and not to the purpose of the arrest. It is beyond question that in making an arrest by virtue of a warrant the officer cannot be required to show the warrant or state the substance of it until the arrest is accomplished. In this case there was no warrant, and the officer could arrest without one only in certain classes of cases. But we think the officer was no more obliged to state the conditions which authorized him to arrest without a warrant, than he would have been to produce his warrant or state the substance of it in case of an arrest on warrant. All that the respondents could require in the first instance was a statement sufficient to show that the person who demanded their submission was an officer acting in his official capacity. This was clearly covered by the designation of Tinkham as the officer, and by his statement that he arrested them by the authority of the State of Vermont.

It appears then that the words of arrest employed by the

officer were such as entitled him to an immediate
submission to his authority, without answering the
question regarding papers. But it is contended that the
manner in which that question was answered, and the
demonstration which accompanied the answer, were such
as might have reduced the offense to manslaughter if death
had resulted from the resistance made, and that conse-
quently the jury should have been permitted to return a
verdict of assault with intent to kill, even though the
words of arrest were sufficient. The charge did not permit
a consideration of the circumstances referred to in
mitigation of the offense. It is doubtless true that an
officer declaring himself to be such, and having full
authority to make the arrest, may conduct himself in such
a manner as to lower the penalty of resistance. But when
the case is void of evidence tending to show anything
that could lawfully mitigate the assault made, it is not
error to confine the jury to the graver offense. *Boyd* v.
*The State*, 17 Ga. 194; *State* v. *Green*, 66 Mo. 631. A
majority of the court think there was nothing in this case
that called for a submission of the question stated. The
incident of the revolver had been preceded by a formal
declaration of arrest, an inquiry as to which was the
officer, the designation of Tinkham in response to this
inquiry, and a further inquiry regarding the possession of
papers. The revolver was shown by being drawn from the
pocket, and was then immediately returned to the pocket.
The act as a whole completely negatived any intention to use
it unless its use was made necessary by resistance. We are
aware that in such moments men sometimes act upon the
preliminary threatening movement before the mind has
taken cognizance of the concluding movement of opposite
import, and that in the consideration of such a question as
the one presented it will not do to rely too much upon a
recital of events in the order of their initiation. But in this
case the acts were connected with remarks which

determined their relation to each other with certainty. Tinkham's production of the revolver was accompanied by a statement that that was all the papers he needed. The shooting was preceded by a statement that the party could not be taken without papers. This remark, made prior to the shooting, in response to the statement which accompanied the exhibition of the revolver, separated the transactions, and characterized the act of resistance. When the evidence is considered together it discloses nothing tending to show that the shooting was done under any misapprehension as to the officers' intention, or for any other purpose than to escape arrest.

It is also objected that the respondents could not be convicted of more than a common assault without the finding of an actual intent to take life, and that the charge permitted the jury to return their verdict without finding this. It has been repeatedly held in cases not involving the matter of arrest that proof of a specific intent to kill is requisite. The intent is the body of the aggravated offense. If death results from an unlawful act the offender may be guilty of murder, even though he did not intend to take life; but if the assault, however dangerous, is not fatal, the offender cannot be convicted of an assault with intent to kill unless the intent existed. An intent to take life may sometimes be presumed from the fact of killing, but when that fact does not exist the intent must be otherwise established. Any inference that may be drawn from the nature of the weapon and the manner of its use is an inference of fact to be drawn by the jury upon a consideration of these with the other circumstances of the case. 2 Bish. Cr. Law, § 741; *Roberts* v. *People*, 19 Mich. 401; *Patterson* v. *State*, 85 Ga. 131: 21 Am. St. 152.

Nor do we find any ground for holding otherwise when the assault is made in resisting arrest. Under an indictment framed like this, a respondent may be convicted of an assault with intent to kill or an assault with intent to

murder. *State* v. *Reed*, 40 Vt. 603. The grade of the assault will depend upon whether the crime would have been manslaughter or murder if death had ensued. But if the death had resulted from resisting an authorized arrest properly made, the crime would have been murder, regardless of the question of malice. So if the assault charged was committed in resisting such an arrest, and was found to have been made with intent to kill, it would have been an assault with intent to murder. But in the case of either assault there must have been the intent to take life. The elimination from the inquiry of malice as the distinguishing test between murder and manslaughter, and so between the two grades of assaults, does not eliminate the question of specific intent, which is an essential element even of the lower offense. The malice which the law infers from resistance to lawful arrest does not cover the intent to do a particular injury, and the question of intent must stand the same as in other cases.

So it becomes necessary to consider whether the matter of intent was properly submitted to the jury. The question was not entirely ignored by the court, but it was omitted from the general propositions submitted, and we think the charge as a whole could not fail to leave upon the minds of the jury an impression that if the circumstances of the arrest were such that the killing of the officer would have been murder, the assault was an assault with intent to murder. The attention of the jury was directed almost exclusively to the question of guilt as depending upon the legality of the arrest. They were nowhere distinctly told that unless the respondents were found to have made the assault with an intent to take life they could be convicted of nothing but a common assault.

We think there was also error in the instruction given as to the liability of all for the act of one. The court charged in substance that if the four persons whom the officers were attempting to arrest were acting together with

a common purpose of resisting arrest, and any one of the four shot an officer in the execution of that design and with an intent to kill, and the other three were present assisting in the assault, all would be guilty of an assault with that intent. Assuming that the charge as a whole was sufficient to require the finding of an actual intent to take life on the part of one, it will be seen that the liability of the others for an assault with intent to take life is made to depend solely upon the illegality of the resistance. It is doubtless true that if all were combined for an unlawful resistance to the officers, and an officer had been killed by one of their number, all would have been guilty of the killing. But no one was killed; and the liability of the actual assailant, other than for a simple assault, depended upon the existence of a specific intent to kill. We think the jury could not be permitted to return a verdict of guilty of an assault with intent to murder against all, on the mere finding of a common purpose to resist arrest. It would doubtless be different if it were found that they acted upon a common understanding that they would do whatever might be necessary to avoid arrest.

The testimony of Paul Tinkham that he was constable of Rochester and was acting as such at the time of the arrest, was properly received. It was not necessary to prove his official character by the record. *Com.* v. *McCue*, 16 Gray 226.

The testimony of Hoyt and Martin, who assisted the constable in making the arrest, that they were called upon by Tinkham to help him arrest some burglars, was properly received. The requisition of the officer was their authorization, and it was proper to show what the officer called upon them to do.

Four men having been arrested, it was not error to permit the witness Harris, the United States Marshal, to state that he had transferred two of them to another jurisdiction.

The statement contained nothing prejudicial to the respondents.

It being necessary for the State to show that the officer had reasonable cause to believe that the respondents had committed a felony, it was proper for the State to show by the witness Hall whatever was communicated by him to the officer as to the information the witness had received, and its source. But the State was at liberty to show that a felony had in fact been committed; and there was evidence, as to which no question is now made, concerning what had taken place in the post office at Ticonderoga. In this connection, and upon this ground, the entire testimony of Hall, and the testimony of Holbrook and Fletcher, were admissible as tending to trace and identify the respondents in their flight from the place of the burglary to the place of their arrest. Proof that a burglary had been committed, and that these men were fleeing from the scene of it immediately after its occurrence, bore upon the question whether they fully apprehended the character and purpose of the persons they assaulted, and the question whether they had a motive to fire upon them with intent to kill. *People* v. *Pool*, 27 Cal. 572.

The State was permitted to show that near the close of the affray the respondent O'Donald ran off and hid in the bushes, and that he was afterwards brought in by two of the officer's assistants, and that when the physician came to dress his wounds and inquired as to his name, age and residence, he remained silent. The first was admissible as an incident of the affray, the second as an incident of the general transaction of which the affray was a part, and the third—in the view of a majority—as subsequent conduct indicative of guilt. The alleged offense was one which involved the respondent's connection with a prior transaction. The question put to him was such as might properly be asked by a physician when called to attend a stranger. The respondent's failure to give his name and

residence upon such an inquiry was evidence of a purpose to conceal his identity.

> *Exceptions    sustained,    sentence    vacated,    and    cause remanded.*

*Start* and *Thompson*, JJ., dissent on the points announced as majority holdings.